# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF ARKANSAS.

### At the January Term, 1857.

---

## THE STATE VS. ALLIS.

It is an established rule that, upon the argument of a demurrer, the Court will, notwithstanding the defect of the pleading demurred to, give judgment against the party whose pleading was first defective in substance.

Where by a public law agents are appointed to enter into a contract on the part of the State, the law, under which they act, is as much a part of the contract, when made by the agents, as if it were transcribed in the contract.

An authority, by act of the legislature, to an agent to enter into a contract, reduce it to writing and sign it on behalf of the State, must be construed to mean merely a power to enter into a simple contract, and not a specialty or sealed contract.

To bind a corporation by specialty, it is necessary that its corporate seal should be affixed to the instrument—the private seal of an agent, fully authorized to enter into a contract on the part of the corporation, would not have that effect; and so an action of covenant will not lie against the State upon a contract entered into by her agents and sealed with their private seals.

*Appeal from the Circuit Court of Pulaski county.*

The Hon. WILLIAM H. FEILD, Circuit Judge.

This cause was argued at considerable length, upon questions not involved in the decision, before Mr. Justice SCOTT, and Mr. Justice HANLY, and the Hon. GEORGE CONWAY, Special Judge—Mr. Chief Justice ENGLISH, not sitting.

Mr. J. J. CLENDENIN, Attorney General, and CUMMINS, for the appellant.

An action of COVENANT in this case is an absurdity. The law authorized the Board to *sign* the contract, but not to seal it. There is a seal of State necessary to make a *covenant*, unless the law required some other seal to be affixed, which was not the case here. *Story on Ag. secs.* 154, 273, *n.* 3. 11 *Sergt. & R.* 120, 129, *Hopkins vs. Mehaffey.*

It may be said that this is technical; and that the contract is as binding *as if it were a covenant*. In response to this we only refer to the decision in *Morehead vs. Grisham,* 13 *Ark. R.* 431.

FOWLER, and WATKINS & GALLAGHER for the appellee.

Mr. Justice HANLY.

This was an action of covenant, brought by the appellee, against the appellant, in the Pulaski Circuit Court, on the following instrument, to wit:

" Articles of agreement and contract made and entered into by and between Horace B. Allis, of the city of Little Rock, in the State of Arkansas, of the one part, and the State of Arkansas, of the other part, *witnesseth:* That, whereas, the said Horace B. Allis, under and by virtue of the provisions of an act of the General Assembly of the State of Arkansas, approved January 11th, A. D. 1851, entitled " an act for building a safe and suitable wall around the Penitentiary, work shops, keeper's house, and for the improvement of the Penitentiary system,"

was the lowest bidder for the building, rebuilding and repairing of said Penitentiary, and for the safe keeping and furnishing the convicts for the term of ten years from the date hereof, under and in accordance with the provisions of the said act of the General Assembly of this State, approved January 11th A. D. 1851, above referred to: Now, the said Horace B. Allis, party of the first part hereto, covenants and agrees to and with the said State of Arkansas, party of the second part, that he will erect and build around the Penitentiary house of the State of Arkansas, a wall of solid masonry, composed of square durable rock, the part of the rock exposed to be so dressed as to present a smooth surface, equal in quality and workmanship (except the out-work) to the basement story of the United States Arsenal in the city of Little Rock, which rock shall be laid with durable cement of lime and sand, and shall enclose a space of three hundred feet one way, by three hundred and fifty feet the other way, the foundation of said wall to be sunk one average depth of three feet below the surface of the ground, and shall be twenty feet high from the top of the foundation, shall be five feet thick at the base, and gradually terminate in a thickness of two feet, with suitable and substantial iron gates to enter into such enclosure.

And the said Horace B. Allis, party of the first part, further consents and agrees to and with the said State of Arkansas, that he will erect within the said wall before specified, and of the same materials as said wall, three work shops, one of which shall be two hundred feet in length by forty feet in width, and twelve feet high in the story; the other two of said work shops shall be each one hundred feet long by forty feet in width, each to be twelve feet high in the story; with windows sufficient to light said work shops, the windows in each to be strongly secured with round iron grates let into the stone sill and stone cap of each window, each window to have twenty-four lights of ten by twelve glass, and the center of each window to be not more than ten feet apart. And the said Horace B. Allis, party of the first part, further covenants and agrees to and with the said State of Arkansas, that he will erect of the

same material as the said wall and work shops before specified, and agreed to be built, one two story house and building of sufficient dimensions to accommodate the keeper and all the subordinate officers employed about said Jail and Penitentiary house, the front of which said house and building shall constitute a part of the wall before referred to.

And the said party of the first part further covenants, that he will thoroughly repair the present Penitentiary house, with good and sufficient roof extending over it, and the walls of said building shall be properly and substantially braced, either with iron rods, so as to make it perfectly secure and safe, the cells in said house to be properly ventilated and made comfortable and healthful, and one of the rooms in said building shall be properly fitted up for a kitchen and for a hospital, and one for a chapel and schoolroom, and that he will provide suitable stoves and fuel to keep the cells, in which prisoners may be confined, warm in the winter.

And the said party of the first part further covenants and agrees to, and with the State of Arkansas, that he will cover all the houses hereinbefore specified to be built, with a good and substantial roof, to be composed of slate, and that all of said work hereinbefore stipulated to be done, shall be finished in a faithful and workmanlike manner, and of good and substantial materials, and that all of said work and buildings shall be finished and completed within ten years from the date of this contract. And the said party of the first part further covenants and agrees to and with the State of Arkansas, that he will well and safely keep and guard the convicts now in, or which may hereafter be put into said penitentiary, with a good and sufficient guard of sober and responsible men, and that he will feed the said convicts with good and wholesome food in sufficient quantities, and that he will clothe the said convicts in a substantial, comfortable and uniform manner, and will furnish said convicts such medicine and medical attendance as they may from time to time, and at all times, require, free of all expense to the said State of Arkansas, and that he will in all things comply with

the act of the General Assembly of the State of Arkansas, in relation to the said penitentiary and the convicts therein, and shall safely deliver to such person or persons as shall be duly authorized to receive the same in behalf of the State, all of the convicts of said penitentiary, and all of the property of the State of every nature and kind which shall remain in his custody or possession at the expiration of this contract.

And the said State of Arkansas, party of the second part hereto, covenants and agrees to and with the said Horace B. Allis, party of the first part, that, for and in consideration of the faithful performance of his agreements and covenants heretofore in this writing specified, she will pay to the said Horace B. Allis, his agents or assigns, the sum of fifty-eight thousand dollars, by quarterly warrants on the Treasurer of said State, in favor of the said Allis, his agents or assigns, but it is expressly stipulated and agreed that not more than six thousand dollars shall be paid to the said Allis, his agent or assigns, in any one year during the continuance of this contract, and until the said fifty-eight thousand dollars shall be paid to the said Allis, party of the first part.

And the said party of the second part further covenants and agrees to and with Horace B. Allis, that he shall have the benefit, management and control of all the prisoners and convicts under his charge in said penitentiary, and may employ them as he thinks best, subject to the laws of the State, and the government and discipline adopted for the management of the penitentiary, and that if the said party of the first part shall die during the existence of this contract, the said contract may be carried out and completed by the executors or administrators of the said Horace B. Allis, party of the first part.

It is further expressly stipulated between the parties hereto, that this contract shall extend and be in force for and during the period of ten years from the date hereof.

In witness whereof, the said Horace B. Allis for himself, and the said State of Arkansas, by her legally constituted agents,

have hereunto set their hands and seals, this 5th day of April, A. D. 1851.

HORACE B. ALLIS,    [SEAL.]

D. B. GREER, *Sec'y State*,    [SEAL.]

C. C. DANLEY, *Auditor*,    [SEAL.]

J. H. CREASE, *Treasurer*,    [SEAL.]

The declaration was in the usual form, and contained several specific assignments of breaches of the covenants sued on.

At the return term of the writ, the State appeared by her qualified and authorized attorney, and craved oyer of the instrument declared on, which was granted by filing a document of which the above is a copy. The State then interposed her four pleas in bar; to the first and third of which issues were taken, and to the second and fourth a demurrer was filed. De_ murrer to these pleas was sustained. Appellant choosing to rest upon the pleas, declined to answer over upon the demurrer being sustained thereto. Trial by a jury upon the issues to the first and third pleas; verdict and judgment for the appellee. Motion for a new trial made and overruled, and exceptions by appellant. The cause was brought to, and is now pending in this court by appeal.

Sundry errors are assigned and relied upon for reversing the judgment of the court below.

Owing to the result of our opinion upon the whole case, it will be unnecessary for us to notice the exceptions taken during the trial relating to the testimony, those taken to the action of the court below in refusing to give certain instructions for, and giving certain others against appellant, and also that which pertains to the overruling the motion for a new trial.

1st. We think there can be no question but that when the court below was considering the appellee's demurrer to the appellant's second and fourth pleas, it should have been considered in relation to the declaration itself: for a party should not demur unless he be certain that his own previous pleading is substantially correct; as it is an established rule, that upon the argument of a demurrer, the Court will, notwithstanding the defect of the pleading demurred to, give judgment against the party

whose pleading was first defective *in substance;* as, if the plea which is demurred to be bad, the defendant may avail himself of a substantial defect in the declaration, unless such defect has been aided by pleading over; and if the first fault would constitute error, the Court will decide upon it though it be not noticed; for on a demurrer the Court will consider the whole record, and give judgment for the party, who thereon appears to be entitled to it. See 1 *Chittys Plead.* 668; *Smith vs. Joyce,* 5 *Eng. R.* 463; *Inglehart vs. The State, etc.,* 2 *Gill & Johns.* 236; *Allen vs. Crofoot,* 7 *Cow.* 46; *Hord vs. Dickman,* 2 *Hen. & Mun.* 652; *Smith vs. Walker,* 1 *Wash.* 135; *Tillotson vs. Stiff,* 1 *Blackf.* 77; *Headington vs. Neff,* 7 *Ohio* 229; *Pearsall vs. Dwight,* 2 *Mass.* 84; *McGuire vs. Cook,* 13 *Ark. R.* 520; *Hynson vs. Burton, ib.* 492; *Byers et al. vs. Aiken, ib.* 419.

The Court below, therefore, on considering the demurrer of the appellee, should have turned to the declaration and determined whether that was good in substance; not having done so, or having done so and erred in its judgment, as it is insisted, we are constrained, from the uniform rules of practice in error in such case, to revert to that portion of the record before us, and determine whether the declaration of the appellee is obnoxious to a demurrer for cause not cured by the subsequent proceedings in the cause. Is the declaration of the appellee good in substance, when viewed in connection with the instrument given on oyer, copied above, and the act of the General Assembly under which that instrument purports to have been made by the parties thereto? We will address ourself to this question, and in doing so, shall take occasion to copy so much of the act of the 11th January, 1851, as pertains to it, or will, in any wise, contribute to its solution. The sections material are as follows:

" SEC. 5. That the Secretary of State, Auditor and Treasurer shall, *ex-officio,* constitute a board of inspection for the Penitentiary. * * * * * It shall be the duty of said board to direct and manage the discipline of the Penitentiary as prescribed by law, and shall every two weeks examine into the

condition of the convicts, and see that they are well provided with clothing and food," etc.      *      *      *      *      *

" SEC. 6. That immediately after the passage of this act, it shall be the duty of the Board of Inspectors to procure proper drawings and specifications of the work to be done under the provisions of this act, and to proceed to let the same out to the lowest and most responsible and competent bidder, on the terms hereinafter specified," etc.      *      *      *      *      *

" SEC. 7. That the Board of Inspectors in making such *contract*, shall," etc.      *      *      *      *      *      *      *

" SEC. 11. That after such contract shall be taken, it shall be reduced to writing, with all the proper terms, stipulations and specifications, and shall be signed by the Board of Inspectors on behalf of the State, and by the contractor; and the contractor shall enter into bond, payable to the State, in the penal sum of twenty thousand dollars, with ample security, to be approved by the Board of Inspectors, conditioned for the faithful performance of said contract," etc.      *      *      *      *

We presume there can be no doubt but that the act of the 11th January, 1851, from which we have made the above extract, was as much a part of the contract made by the Board of Inspectors thereunder, as if it had been absolutely transcribed into it, for the reason that it was a public law of the land, of which, not only the Inspectors, but all other persons were bound to take notice. The Inspectors had to look to that act for their authority to make the contract. It was the power under which they were to act. The public were advertised of its provisions. When the act in question uses the generic word *contract*, and empowers the Inspectors therein named, to make a *contract*, in the name and behalf of the State, in respect to the subject matter of the act, what are we forced to conclude the legislature meant by the employment and use of that generic word in the act in question? Certainly, the context of the act will explain what extent of power, with respect to the grade of the *contract*, the legislature intended to confer upon the Inspectors; for it will be perceived in one section of the act (*see sec.* 11), it is provided, among other things, " that after such

*contract* shall be taken, it shall be reduced to writing, with all the proper terms, stipulations and specifications, and shall be signed by the Board of Inspectors, on behalf of the State," etc. A *contract* simply signed, whether by a natural or artificial person, of course belongs to that class of contracts denominated simple, parol or unsealed. If it had been the purpose of the legislature to have conferred upon the Inspectors the power to make a sealed contract, obligatory upon the State as such, they should have so expressed the purpose in the act, and at the same time have provided for the affixing of the seal of the State thereto by the Governor, or some one else. The constitution of the State, *sec*. 12, *art*. 5, ordains: "That there shall be a seal of this State, which shall be kept by the Governor, and used by him officially." It is the seal of the State, under this provision, which assumes and verifies the acts of the State, whether as a sovereignty or corporation. She can perform no corporate or sovereign act through her chief Executive without it is verified by this seal; and we doubt, exceedingly, whether the legislature possesses the power by act to prescribe any other mode for the authentication of the sovereign or corporate acts of the State, except by means of the seal ordained by the constitution, and required to be kept and, consequently, affixed by the Governor. Certainly, in the case at bar, there seems to have been no intention on the part of the legislature to assume or exercise this doubtful power. The act in question does not purport to authorize the Inspectors to seal the contract, to verify or render more solemn the instrument on their part. The argument would have been rendered more specious, if the legislature had absolutely authorized the Inspectors to have entered into a *covenant* in the name of the State with regard to the subject matter confided to them by the act in question, for in that event the power might be implied, from the general grant, that if they could not procure the affixing of the great seal by application to its constitutional custodian, the Governor, they might supply it in some other mode.

But, discarding this view of the subject, and regarding the contract declared on as one, entire and independent, and to be

construed, as to its legal effect, without reference to the act under which it purports to have been made, and we hold, leaving out of view also the state as a sovereignty, but considering it as a corporation, that the instrument declared on is not technically the deed of the State, and as a legal consequence, that covenant against the State, cannot be maintained on it. An instrument, to which the agent of a corporation has affixed his seal, may be evidence of the contract, in an action of assumpsit against the corporation: for, the seal of the agent of a corporation, unlike that of the agent of a natural person, never can be the seal of his principal—the corporation. 1 *Parsons on Cont.* p. 94, *note f. Randall vs. Van Vechten,* 19 *T. Rep.* 60. *Dawson vs. Inhabitants of Granby,* 2 *Pick. R.* 345. *Bank of Columbia vs. Patterson's ad.,* 7 *Cranch,* 299.

Whilst we are free to concede, both from the tenor of the instrument sued on, and the act under which it was made, that the State is liable thereon, in one or more forms of action, we are forced to the conclusion, from the considerations above expressed, supported as we conceive them to be by both principle and authority, that an action of covenant will not lie against the state at the suit of the appellee, upon the instrument in question. We therefore hold that the Court below erred because it did not give judgment in bar in favor of the appellant; and for this reason, the judgment of the Court below rendered herein is reversed, and this cause remanded to the Circuit Court of Pulaski county, with directions to that Court to consider and sustain the demurrer by relation, as if it had been interposed by the appellant, and applied to the declaration of the appellee, and on doing so, that that Court proceed to render judgment in bar for the appellant.

Let the judgment be reversed, and the cause remanded, with the above directions.

Mr. Justice SCOTT:

This cause was a good deal examined by the special judge commissioned to sit in its trial, together with my brother Hanly, towards the close of the last term; and they arriving at the

conclusion that the judgment ought to be reversed, and consequently that the party interested would be no nearer to an application to the Legislature for satisfaction by a decision then, than now, preferred, as they announced from the Bench, to defer final action until there was a full Bench. And we now all concur in the opinion that the judgment ought to be reversed. The ground upon which it has been placed seems to me to be a sound one. Undoubtedly, the suit must proceed upon the ground that the State is a corporation—an artificial person. Nations and States are denominated by publicists, *bodies politic*. They are a collective and invisible body, having affairs and interests in common, upon which they deliberate and resolve, and in reference to which they act, as moral persons, having an understanding and will peculiar to themselves, and are therefore susceptible of obligations and laws. In this sense, the King of England is a corporation, and so are the United States, as well as each of the States. *Angell and Ames on Corporations, p.* 10, *sec.* 15.

" To bind a corporation by specialty, it is necessary that its corporate seal should be affixed to the instrument. * * * * * * The corporate seal is the only *organ* by which a corporation can oblige itself by *deed:* and though its agents affix their *private* seals to a contract binding upon it, yet these not being seals, as regards the corporation, it is in such case bound only by simple contract." (*Ib. p.* 309, *sec.* 295.)

But, "the seal of a corporation, when affixed to any deed or contract, by proper authority, is not distinguishable in its legal effects from that of an individual. The one is the seal of an artificial, the other of a natural person." *Clark vs. Farmer's Manuf. Co.* 15 *Wend. R.* 257.

"There is a difference between an agent executing a sealed instrument, thereby intending to bind his principal, which principal is an individual, and the agent of a corporation doing the same thing with the same intent. In the former case, the seal may, by a prior authority or subsequent adoption, be the seal of the principal; and if there be no such authority it shall bind the agent as his own act and deed. In the latter case, the seal can never be that of the corporation: for they have but one

common seal, and that can never be changed except by authority emanating from the power which created the corporation; and it can be put to an instrument only in pursuance of a vote of the corporation, or by the officer who may be the keeper, and entrusted with the use of it. Their agent, therefore, who contracts for their use under his own seal, does not bind the corporation in a deed; though, if he had authority to make the contract, it shall be binding upon them as evidence of such contract. The cases of *Randall vs. Van Vechten*, 19 *John. R.* 65, and *Bank of Columbia vs. Patterson ad'r*, 7 *Cranch* 305, are satisfactory authorities upon this point." Per PARKER C. J. delivering the opinion of the Court in the case of *Damon vs. Granby*, 2 *Pick. R. p.* 352–3.

To the same effect is the case of *Randall vs. Vechten*, where the Court say: " It is important to remark the difference between a *corporation* and an *individual person* acting by agent. In the one case, there is a corporate seal, which is the only organ by which the body politic can *covenant*. The seals of these defendants are not, in any sense, the seals of the corporation; but the seal of an agent for an individual person as his principal, is, in law, the seal of his principal; and therefore it is, that the form of action against the *principal*, in the one case, (that of the corporation) is not determined by the *form* in which the agent contracts; while in the other case (that of an individual) the action against the principal must correspond with the form by which the agent contracts, whether by *seal*, or by *simple contract*. Nor will it make any difference whether the agents for the corporation were appointed under the *corporate seal*, or by a *resolution* in the minutes. It may be legally done in either mode: and whether it be in the one mode or the other, cannot vary the form of the action against the corporation.

" When the real party to a contract has affixed his seal, the specialty implies a *merger*, and the opposite party cannot waive the covenant, and resort to the *assumpsit*. But this rule has no application here; because the corporation *have not affixed their seals* to this contract. The seals of the agents *are not seals* as regards the corporation. The old doctrine, that *assumpsit* will

not lie against a corporation, is now exploded." (19 *John. R. p.* 65.)

The case before the Court is to be distinguished from some cases to be found in the books—where, in the absence of every thing in the case to show whether or not the corporation ever had a common seal, and what it was, the Court *would presume*, when the contract was made in the name of the corporation and purported to be sealed in its name, that the *impression upon the paper* of the *scroll affixed*, had been *adopted* as the common seal of such corporation. Because we judicially know that the State of Arkansas has a great seal, and there is no room to presume that any mere scroll could be her seal.

Nor can the State be considered as *estopped* from setting up this defence upon the ground that she may have received some benefit from the contract sued upon; because the question of *execution* stands upon different ground from that of *authority:* " for, while a corporation is generally estopped from denying that a contract or an instrument was made by its authority, if it receives and holds the beneficial result of the contract, or the instrument, as the price for property sold, or the like, it may, or its creditors may deny that the instrument was *legally executed*, even if the *authority* were certainly possessed. Thus, if a conveyance purporting to be the conveyance of a corporation, made by one authorized to make it for them, be in fact, executed by the attorney as his own deed, it is not the deed of the corporation, although it was intended to be so, and the attorney had full authority to make it so. And if the deed be written throughout as the deed of the corporation, and the attorney when executing it declares that he executes it on behalf of the company, but says: " In witness whereof I set *my hand* and *seal*," this is *his* deed only, and does not pass the hand of the corporation." (1 *Parsons on Cont. ch.* 10, 2d ed. top *p.* 118, 119; *citing Brinly vs. Mann*, 2 *Cushing's R.* 337.)

In addition to this legal reasoning contained in these authors, there is a case reported in the 4th *vol. Florida Rep. p.* 200, which seems to me to be strongly in point. It was an action of *covenant* by *Mitchell* against the *St. Andrew's Bay Land Co.*, a cor-

poration, upon an instrument of writing commencing: "This memorandum of an agreement made and entered into between the St. Andrew's Bay Land Company, on the one part, and N. H. Mitchell on the other part, witnesseth: that said company has this day," etc.: (proceeding to set out the contract:) and concluding as follows, to wit: "signed, sealed and delivered duplicates, this 11th day of May 1841." Signed:

    " The St. Andrew's Bay Land Company, by

| | |
|---|---|
| RICHARD H. LONG, | [SEAL.] |
| WM. NICKELS, | [SEAL.] |
| A. H. BUCK, | [SEAL.] |

*Committee.*

N. H. MITCHELL,    [SEAL.]

The defendant pleaded that said persons named in the declaration were not authorized, under the seal of said company, to execute the writing named in the declaration. To which plea there was a replication, that said persons were authorized; and further that their acts or execution of said writing under seal was ratified by the President, Directors and Trustees of said company. Demurrer to the *replication* for duplicity. Going back to the declaration, the Court, by ANDERSON, C. J., say: " The question is, can an action of covenant be sustained against the St. Andrews Bay Land Company, on the indenture here described. * * * * * The defendants certainly did not execute the indenture described, by *themselves*, and the only inquiry is, whether they executed the deed under seal, by *some other person?* The declaratian says the indenture was sealed with the respective seals of Long, Nickels and Buck; and though it is alleged these persons were duly authorized by the Land Company, such allegation can only mean they were *authorized* to make the agreement, *not to affix the seal of the company;* and what is still more material, there is no allegation that the seal of the company was affixed, and no such seal is in fact affixed to the agreement, which is appended to the declaration. The committee might have been fully empowered to make the agreement, and having made it, the company would be fully responsible, for a breach of it, to the plaintiff, in some form of action:

but *surely not in an action of covenant,* which cannot be maintained except against a person who has executed a deed under seal. The private seals of the company are not the seals of the corporation, and consequently the plaintiff is here suing a defendant in covenant, who according to his own showing, has not executed a deed under seal.

We refer in support of these familiar positions, to *White vs. Skinner* 13 *John. R.* 307. *Randall vs. Van Vechten et al.* 19 *John. R.* 60 and *Taft vs. Brewster et al.* 9 *John. R.* 334."

Hon. GEORGE CONWAY, Special Judge.

Prior to the adjournment of the July term, the subject of this cause was considered by brother Hanly and myself, in the absence of brother Scott. We determined upon the result, which has been expressed in the opinion already delivered, but considering the magnitude of the cause, and the importance of the principles involved in it, upon consultation it was determined that our opinions should not be expressed until the bench should be filled by our senior brother. The preparation and delivery of the opinion of the Court was very kindly confided by brother Hanly to myself. I had proceeded in discharge of the duty confided to me so far as to prepare the statement of the case, intending to have prepared the opinion of the Court, to be delivered at the present term, in the vacation of the Court, but a few days after the adjournment, and before I could reach my home, I was stricken down by disease, from which I have not yet entirely recovered. At my request, brother Hanly undertook to prepare and write the opinion of the Court. I have examined that opinion, and most heartily concur, not only in its result, but its reasoning and argument. The opinion of brother Scott, the result of which is the same as that of brother Hanly, arrived at possibly by different reasoning, I also concur in, regarding it as I do, as an elaboration of the main point in the cause, to an extent which places it upon such ground as to render it perfectly clear and impregnable.

The judgment should be reversed, and the cause remanded, to be proceeded in as directed in the opinion of brother Hanly.